**UNITED STATES DISTRICT COURT**
**IN THE DISTRICT OF SOUTH CAROLINA**
**AIKEN DIVISION**

_____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | C.A. No. _____ |
| **Plaintiff**, | ) | |
| | ) | **FILED IN CAMERA and UNDER SEAL** |
| *Ex rel.* SHAWN MAYERS, | ) | **pursuant to 31 U.S.C. §3730(b)(2)** |
| | ) | **[Exempt from ECF]** |
| **Plaintiff-Relator**, | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | |
| LACY SCHOOL OF COSMETOLOGY, | ) | **JURY TRIAL DEMANDED** |
| LLC and ERNEST J. "JAY" LACY | ) | |
| | ) | |
| **Defendants.** | ) | |

_____

## I.    <u>INTRODUCTION</u>

1.    Plaintiff-Relator SHAWN MAYERS (Mayers) brings this Complaint on behalf of himself and the UNITED STATES OF AMERICA pursuant to the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, against Defendants LACY SCHOOL OF COSMETOLOGY (LSC) and ERNEST J. "JAY" LACY (LACY) to recover damages and civil penalties arising from Defendants' wrongful conduct in a false claims scheme that has defrauded the United States Department of Education (Department) of substantial monies by exploiting Defendants' fiduciary obligations to lawfully administer federal grant and loan financial aid money and instead systematically and fraudulently distributing those funds into its own bank account in violation of Title IV of the Higher Education Act of 1965 (HEA) and the federal False Claims Act.

2.    In addition to their wrongful theft of Title IV financial aid funds, Defendants have falsely stated to the Department that they would comply with numerous statutory and regulatory requirements—including the requirement that they not discriminate against any students' participation on the basis of race or national origin—when in fact Defendants flagrantly ignore regulatory procedures, regularly falsify required loan and accounting documents, and enforce an unwritten policy of racial discrimination by denying black students admission to LSC.

3.    Mr. Mayers brings this *qui tam* action for the purpose of ending this fraud and recovering monies defrauded from the United States Department of Education's student grant and loan program. Mr. Mayers also seeks damages resulting from the Defendants' retaliatory termination of his employment for objecting to these practices.

## II.    JURISDICTION

4.    Mr. Mayers brings this action on behalf of himself and the UNITED STATES for violations of the federal False Claims Act, 31 U.S.C. §§ 3729 et seq.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

5.    This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) and because Defendants transact business in this District and numerous acts prohibited by 31 U.S.C. § 3729 occurred in this District.

6.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this District and numerous acts proscribed by 31 U.S.C. § 3729 occurred in this District.

7.    Mr. Mayers' claims and this Complaint are not based upon prior public disclosures of allegations or transactions in a federal criminal, civil, or administrative hearing in which

the Government or its agent is a party; in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or from the news media, as enumerated in 31 U.S.C. § 3730(e)(4)(A). To the extent that there has been a public disclosure unknown to Plaintiff-Relator, he is the "original source" and the public disclosure is a result of Plaintiff-Relator voluntarily providing this information to the UNITED STATES prior to filing this *qui tam* action. 31 U.S.C. § 3730(e)(4)(B).

## III.    PARTIES

8.    Plaintiff-Relator SHAWN MAYERS (Mayers) is the former Chief Operating Officer of LACY SCHOOL OF COSMOTOLOGY, LLC. Mayers was hired on January 31, 2011, and served as COO from May 2011 until September 20, 2012, when he was terminated for confronting the owner, JAY LACY about the wrongful conduct at issue in this case.

9.    LACY SCHOOL OF COSMOTOLOGY, LLC (LSC) is a limited liability company organized under the laws of the State of South Carolina. LSC's a for-profit educational institution providing coursework to students seeking to obtain certificates as cosmetologists, nail technicians, and estheticians. LSC also provides continuing education coursework to current practitioners. LSC has four campuses: Aiken, South Carolina, the main campus; Lexington, South Carolina; Goose Creek, South Carolina; and Charleston, South Carolina.

10.    ERNEST J. "JAY" LACY (LACY) is the sole owner of LSC.

## IV.    <u>FACTUAL ALLEGATIONS REGARDING TITLE IV STUDENT LENDING</u>

## A.    **Participation as a Title IV Educational Institution**

11.     The purpose of Title IV of the HEA is to make postsecondary education available to eligible students by providing federal grant and loan aid to students who demonstrate financial need. 20 U.S.C. § 1070(a).

12.     In order to be eligible to receive Title IV funds, a student must be enrolled in a qualified degree, certificate, or other program at an eligible institution of higher education institution. Id. § 1091(a); see also 34 C.F.R. § 600.5.

13.     An "eligible institution" is an institution that has entered into a Program Participation Agreement (PPA) with the Secretary of Education (Secretary). Id. § 1094(a); see also 34 C.F.R. § 668.8 (defining "eligible program").

14.     LSC is an eligible institution that has entered into a PPA with the Secretary.

15.     The PPA conditions an institution's "initial and continuing eligibility […] to participate in a program" upon compliance with its statutory and regulatory mandates. Id.; see also 34 C.F.R. § 668.14(b) (establishing thirty-one regulatory conditions for participation.

16.     The PPA requires, in part, that participants

    a.  Comply with all statutes, regulations, and policies governing federal funds;

    b.  Use funds, and any interest or other earnings, "solely for the purpose specified in and in accordance with the provision of that program." 20 U.S.C. § 1094(a)(1); see also 34 C.F.R. § 668.14(b)(1);

    c.  "[E]stablish and maintain such administrative and fiscal procedures and records as may be necessary to ensure proper and efficient administration of funds received from the Secretary or from students […], together with assurances that the institution will provide, upon request and in a timely fashion, information relating to the administrative capability and financial responsibility of the institution to-- (A) the Secretary; (B) the appropriate guaranty agency; and (C) the appropriate accrediting agency or association." Id. § 1094(a)(3); see also 34 C.F.R. § 668.14(b)(4).

    d.  "[N]ot provide any student with any statement or certification to any lender under part B of this subchapter that qualifies the student for a loan or loans in excess of

5

the amount that student is eligible to borrow in accordance with sections 1075(a), 1078(a)(2), and 1078(b)(1)(A) and (B) of this title." <u>Id.</u> § 1094(a)(6).

e.  Participate in the Integrated Postsecondary Education Data System (IPEDS) data collection survey or any other federal effort to collect information as designated by the Secretary Id. § 1094(a)(17); <u>see</u> also 34 C.F.R. § 668.14(b)(19).

f.  "[M]eet the requirements established by the Secretary and accrediting agencies or associations, and will provide evidence to the Secretary that the institution has the authority to operate within a State." <u>Id.</u> § 1094(a)(21).

g.  "[C]ertify that the institution-- (A) has developed plans to effectively combat the unauthorized distribution of copyrighted material, including through the use of a variety of technology-based deterrents; and (B) will, to the extent practicable, offer alternatives to illegal downloading or peer-to-peer distribution of intellectual property, as determined by the institution in consultation with the chief technology officer or other designated officer of the institution." <u>Id.</u> § 1094(a)(29).

h.  Comply with Title VI of the Civil Rights Act of 1964, as amended, barring discrimination on the basis of race, color, or national origin. 42 U.S.C. § 2000d.

17.  Participating institutions are also required to comply with any and all regulations promulgated by the Secretary concerning the sound administration of financial aid programs. <u>Id.</u> § 1094(c)(1)(A)-(B); <u>see</u> 34 C.F.R. §§ 668.1 <u>et</u> <u>seq</u>. (rules promulgated by the Secretary).

18.  These regulations also condition an institution's participation on its written PPA *and continued compliance* with the terms set forth therein. <u>See</u> 34 C.F.R. § 668.14.

19.  Significantly, the regulations explicitly state that participating institutions must agree to act as a fiduciary responsible for administering Title IV funds. <u>Id.</u> § 668.14(b)(2).

20.  Acting as a responsible fiduciary means, in part, managing Title IV funds in accordance with the federal cash management regulations. <u>Id.</u> §§ 668.161 <u>et</u> <u>seq</u>.

**B.    Authorizing and Disbursing Title IV Funds**

21.    Participating institutions are allowed to authorize student financial aid within the guidelines provided by the Secretary. This requires, in part, that the institution verify student information, like family income, to ensure the student is actually eligible for need-based aid. Id. §§ 668.53 - 668.57.

22.    Generally, there are three types of federal financial aid accessible to qualifying students: Pell Grants, Stafford Loans and PLUS Loans. The availability of some of all of these forms of financial aid depends on the student's need as determined by the Free Application for Federal Student Aid (FAFSA).

23.    A participating institution's financial aid department can "authorize" a qualifying student to receive federal grant money or borrow federal funds. This authorization results in an "award" by the Department.

24.    While awards are specific to each student, the Department does not make individual disbursements to each student for each financial aid award. Instead the Department funds a "G-5" federal account for each participating institution with Title IV funds each year on July 1.

25.    This G-5 account is funded at a level determined by a formula that considers the institutions enrollment and prior federal student aid.

26.    The Secretary has also authorized a participating institution to receive Title IV funds on behalf of a student receiving an award and hold those funds in trust for the payment of tuition and other educational expenses. Id. § 668.165; See also, id. § 668.162(e) ("cash monitoring payment method").

27.    If authorized by a student, a participating institution's bursar or accounting department can disburse or transfer Title IV funds from a G-5 account into the institution's bank

account. This transfer, over which the participating institution has complete control, constitutes disbursal of the student's Title IV grant and loan funds *to the student*.

28.    A participating institution can disburse funds into its own operating account as those funds are earned by the institution. Id.

29.    Institutions that measure progress in credit hours, rather than academic terms or semesters, earn payment, as students reach set regulatory benchmarks. Id. § 668.4(c).

**C.    LSC's Coursework and Financial Aid Procedures**

30.    Students seeking a cosmetology certificate from LSC must complete 1,500 hours of instruction in order to earn their certificate. Students seeking a nail technician certificate or an esthetician certificate must complete 450 and 600 instruction hours, respectively, to earn their certificates.

31.    As an "hours school," LSC admits students and coursework occurs on a rolling basis. There are no semesters or quarters.

32.    A full time student can complete the 1,500-hour program within 188 days of enrollment and is scheduled to complete this coursework within one calendar year from the date that classes begin.

33.    LSC charges a total of $18,315 for this coursework: $100 admission fee; $16,900 in tuition; $1,450 for tools, books and supplies; and $165 State Board Test fee.

34.    When students enroll at LSC, they sign a contract informing them that they must graduate within 13 months of their date of enrollment to avoid extra charges.

35.    Approximately 80% of LSC's students are in need of financial aid to pay for their education.

36.     The maximum Pell Grant students were eligible to receive in 2012 was $5,550 for the academic year. Students do not have to repay Pell Grants.

37.     Students do have to repay federal Stafford Loans, but qualifying students can also receive subsidized Stafford Loans. The federal government makes interest payments for students receiving subsidized loans.

38.     LSC students with a financial need can finance the entire $18,615 cost of their cosmetology education through Pell Grants and Stafford Loans.

39.     Students can also for a federal PLUS Loan to cover additional education-related expenses. PLUS Loans have a higher interest rate than Stafford Loans.

40.     Based upon a student's FAFSA results, LSC's financial aid staff requests an award of financial aid from the Department.

41.     Once the Department makes an award to a student, LSC notifies the student and requires the student to sign a notice authorizing LSC to transfer Title IV funds on the student's behalf and manage the student's account balance.

42.     LSC is authorized to make disbursements each time a student completes one-quarter of the total hours needed to complete the certificate.

43.     Disbursements can only occur once funds are earned.

44.     In order to track progress toward these four payment thresholds, instructors complete monthly progress reports indicating the number of hours completed that month. Instructors send these monthly updates to the bursar.

45.     The bursar is supposed to use this information to determine from which students the school has earned tuition. The bursar may disburse funds from the G-5 account into the school's operating account for those students with tuition due.

46.    Within 72-hours of a disbursement, the bursar is supposed to make an entry into each student's account in the Department's Common Origination & Disbursement (COD) website indicating the date and amount of the disbursement.

47.    A printed copy of this report must also be sent from the bursar to the student's instructor. The instructor uses this report to update the account ledger in the student's file showing the total amount of Title IV funds pulled thus far and the outstanding tuition balance.

48.    Financial aid authorization and disbursement must occur independently of one another by separate individuals in the financial aid and bursar offices, respectively.

49.    Funds are not segregated into separate bank accounts but are instead co-mingled in both the G-5 account and LSC's operating account, making timely and accurate ledger-keeping essential to the lawful management of Title IV funds.

## V.    FACTUAL ALLEGATIONS REGARDING DEFENDANT'S CONDUCT

### A.    Racially Discriminatory Admissions Policy

50.    At the direction of LACY, LSC has implemented an unwritten policy of racial discrimination into its student admissions policy with the purpose and effect of denying admission to otherwise-qualified black applicants.

51.    LACY has instructed employees charged with admitting students at the four LSC campuses not to admit black applicants.

52.    LACY specifically instructed these employees to tell black applicants seeking admission that the school is "not accepting new students" and that there is a "waiting list" for admission.

53.    In fact, there is no waiting list.

54. LACY told his employees to tell black students that LSC is the "other school," meaning the "white" school.

55. LSC does not teach black hairdressing while almost all other cosmetology schools in South Carolina do.

56. LACY has became upset upon arriving at LSC branch locations and seeing what he believed to be "too many" black students in his schools, particularly at the Goose Creek and West Ashley campuses.

57. On one occasion in April 2012 at the Aiken Main Campus LACY arrived at the school and was confronted by a small group of black students who complained that LSC was not teaching black hairdressing techniques.

58. LACY told the students if they did not like LSC's instruction they should "get out."

59. LACY entered the building and spoke to LSC staff and told them "don't let any more niggers in here."

**B.     Stealing Title IV Funds**

60. LSC illegally authorizes and disburses unearned Title IV funds into LSC's operations account.

61. These funds are disbursed at the direction of LACY as he deems necessary to cover personal and business expenses.

62. LSC's Financial Aid Director Shelia Dixon authorizes student aid awards to students without verifying the student is eligible for the award sought.

63. LSC never completes these verifications.

64. Once an award is authorized, LSC arbitrarily disburses funds as directed by LACY.

65.  LSC disburses funds from the G-5 account into LSC operating account without consideration for whether funds are earned as indicated by a student's monthly progress reports.

66.  LACY and Dixon "pull" an arbitrary amount of money from the G-5 account and transfer it into LSC's operating account each week.

67.  LACY and Dixon are solely responsible for disbursing funds, a violation of the Department's mandate that these tasks are delegated to separate individuals.

68.  LSC fails to make timely reports of these transfers using the COD website. Transferred Title IV funds are not attributed to a specific student's account often until weeks later.

69.  These practices regularly result in unauthorized disbursements and overpayments that are not refunded.

70.  LSC also draw funds on behalf of students who have breached the attendance policy and should be dropped from the attendance rolls or who have withdrawn.

71.  LSC also authorizes additional student financial aid when a student's enrollment extends beyond the contractual one-year period.

72.  These practices give LSC access to additional Title IV funds. LSC disburses these additional Title IV funds in the same wrongful manner described above.

73.  LACY regularly uses LSC's operating account, funded with Title IV funds, as his own personal bank account to pay large and small personal expenses unrelated to tuition costs or other legitimate business expenses.

74.  For example, LACY used the LSC account to pay for personal dinners, personal loan payments, his daughter's mortgage, his daughter's electric and water bills, and his step-daughter's wedding in Jamaica.

12

75. Defendants have failed to reimburse the Department or students for these misappropriations.

**C.    Concealing Regulatory Violations and Title IV Fund Theft**

76. Defendants have employed a number of schemes to conceal LSC's false claims scheme and breach of the PPA.

77. LACY and Dixon use an username and password in another employee's name to make it appear that they have a bifurcated authorization and disbursement procedure, when in fact, they are solely responsible for authorizing and disbursing funds.

78. Mr. Mayers told LACY what LSC was doing was "illegal" but LACY responded saying it was "no big deal."

79. LSC also falsifies documents and records, like student ledger records; monthly progress reports; income verifications; and Entrance Interview and Exit Interview forms.

80. LSC falsifies these records as part of an ongoing effort to conceal the fraud and deceive the Department into believing LSC is complying with the PPA and its regulatory obligations.

81. LSC also falsifies its Integrated Postsecondary Education Data System (IPEDS) data to make it appear to the Department that more racial minorities attended LSC than those actually attending.

82. This fraud conceals the Defendants' policy of racial discrimination towards black students.

**D.    Selling Pirated Textbooks**

83. In December 2011, Defendants began selling a pirated digital textbook to students.

84. Pursuant to this scheme, LSC began mandating that students purchase a Kindle Fire e-book reader and a digital copy of the textbook Milady's Cosmetology instead of a printed paper copy.

85. Students buy a Kindle with the textbook preloaded from LSC.

86. On or about August 2012, Mr. Mayers discovered that LSC did not purchase licenses to load these textbooks.

87. LACY told Mr. Mayers that he had somehow "broken the [digital download] code" and that it "was not a big deal."

88. Milady's standard Cosmetology 2012 e-book sells for approximately $90.

89. LSC sells the Kindle, the digital textbook license, and a cosmetology kit to students for a total of $1,450.

90. Students use Title IV funds to purchase the Kindle and textbook.

**E.    Defendants' Retaliation Against Relator**

91. Defendants retaliated against Mr. Mayers for objecting to the above-described practices by terminating his employment.

92. LACY hired Mr. Mayers in January 2011. In May 2011, he was promoted to COO to manage all of the day-to-day operations of LSC.

93. At the time of his hiring, LACY told Relator that LSC lacked sufficient funds to pay him commensurate with his experience and skill.

94. Instead, the parties agreed that Mr. Mayers would begin working at a three month annual rate of $40,000 and then receive an increase to an annual rate of $60,000 the following three months and finally an increase after that to an annual salary of $80,000.

95. Mr. Mayers received the first increase but not the second.

96.    LACY told him LSC did not have sufficient funds. Mr. Mayers agreed to keep working because he liked his job and believed LACY to be telling the truth.

97.    In August 2011, Mr. Mayers was reviewing rent payments in Quickbooks, and noticed LSC had sufficient funds to pay him the salary he was promised.

98.    When Mr. Mayers confronted LACY about this, LACY said the money was needed for other expenses. The next day Quickbooks removed from the server.

99.    This was the first time Mr. Mayers became suspicious about LSC's true financial condition.

100.   These suspicions were confirmed in May 2012 when the Department issued a report detailing serious regulatory non-compliance in 18 of 30 student files the Department reviewed.

101.   That report required that LSC hire an independent auditor to assist in providing a written response within 90 days.

102.   Over those 90 days, Mr. Mayers worked with LACY, Dixon and the independent auditor to compile LSC's response.

103.   During this period, Mr. Mayers discovered the allegations detailed above and became increasingly troubled that that the wrongdoing far exceeded the regulatory violations discovered by the Department's limited review.

104.   Mr. Mayers was also troubled that LSC was actively falsifying records and submitting false statements to the Department in response to its review in order to cover up the extent of the wrongdoing.

105.   Mr. Mayers confronted LACY about this wrongdoing but LACY refused to discuss it.

106.    On September 13, 2012, Mr. Mayers hand delivered a letter to LACY detailing a number of his concerns, including many of the allegations in this case.

107.    On September 19, 2012, at Goose Creek, Mr. Mayers met with LACY, Dixon, and the auditor to continue discussing LSC's efforts to respond to the Department. LACY left the meeting without address Mr. Mayers' concerns.

108.    On the morning of September 20, 2012, at the Goose Creek Campus, LACY terminated Mr. Mayers.

109.    When asked for a reason for his termination, LACY said he did not have to provide Mr. Mayers with a reason.

110.    Around the same time as Mr. Mayers' termination, LACY also terminated the independent auditor he hired pursuant to the Department's instruction.

<u>**COUNT I**</u>
**VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(A) & (B)[1]**
**BY FALSELY CLAIMING NOT TO DISCRIMINATE BASED ON RACE**
**(AGAINST ALL DEFENDANTS)**

111.    Mr. Mayers re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

112.    Defendants discriminated against prospective students by denying and discouraging their admission on the basis of race.

113.    Defendants' policy of racial discrimination breaches Defendants' PPA with the Department and Title IV of the HEA which the Defendants certify their compliance with the anti-discrimination provision of the Civil Rights Act of 1964's which states that "[n]o person in the United States shall, on the ground of race, color, or national origin, be

---

[1] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint also alleges violations of the federal False Claims Act prior to its recent amendments <u>e.g.,</u> 31 U.S.C. § 3729(a)(1).

excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

114. Defendants knowingly and falsely created and submitted documents and electronic records concealing their racially discriminatory conduct.

115. As a result of Defendants' repeated false certification and statements, Title IV federal funds were made available and disbursed into Defendants' operating account.

116. Defendants knowingly and falsely certified their compliance with Title IV's anti-discrimination mandate each time they disbursed Title IV funds into their operating account.

117. Defendants knew that the Department relied and continues to rely on their false certification that they do not discriminate on the basis of race as a condition of Defendants' participation as a Title IV institution.

118. Defendants' fraudulent claims were presented and paid and continue to be presented and paid by the Department from the Department's G-5 federal account.

119. Defendants' conduct is a violation of 31 U.S.C. § 3729(a)(1)(A) & (B), as amended.

## COUNT II
### VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(A) & (B)[2] BY CREATING FALSE DOCUMENTS AND RECORDS TO CONCEAL DEFENDANTS BREACH OF THE PROGRAM PARTICIPATION AGREEMENT AND FEDERAL LAW (AGAINST ALL DEFENDANTS)

120. Mr. Mayers re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

---

[2] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint also alleges violations of the federal False Claims Act prior to its recent amendments e.g., 31 U.S.C. § 3729(a)(1).

121.    Defendants are in breach of their PPA with the Department and applicable federal statutes and regulations requiring participating institutions to maintain administrative procedures necessary to the lawful administration of student financial aid funds.

122.    Defendants' have knowingly and willfully failed to implement procedures in the manner described above, including but not limited to:

        a.    Income verification;

        b.    Student loan counseling;

        c.    Student account balances and ledgers;

        d.    Monthly student progress reports;

        e.    IPEDS reporting;

        f.    COD reports;

        g.    Disbursing Title IV funds;

        h.    Student attendance;

        i.    Refunding overpayments.

123.    Defendants have also knowingly and falsely created documents and electronic records in an effort to conceal their non-compliance from the Department. This conduct includes, but is not limited to, including but not limited to:

        a.    Falsifying student income verifications;

        b.    Falsifying loan counseling acknowledgment forms;

        c.    Falsifying student account ledgers;

        d.    Falsifying monthly student progress reports;

        e.    Falsifying IPEDS statistics;

        f.    Filing untimely and/or false COD reports;

124.   Defendants knew that the Department relies on participating institutions enacting and following proscribed procedures.

125.   Defendants also knew that the Department relies on the accuracy of documents and records when authorizing a Title IV financial aid award and funding an institution's G-5 account.

126.   Defendants also knew that the Department relies on Defendants' truthfulness and sound administration as a fiduciary for the Department and students when allowing Defendants to transfer Title IV funds from the G-5 federal account into Defendant's operating account.

127.   Finally, Defendants knew that their continued participation as a Title IV institution was contingent on their ongoing compliance with the PPA and all federal statutes and regulations.

128.   Defendants knowingly and falsely certified that they were in compliance each time they authorized a financial aid award and/or disbursed funds without the proper procedures or documents in place.

129.   Defendants' fraudulent claims were presented and paid and continue to be presented and paid by the Department from the Department's G-5 federal account.

130.   Defendants' conduct is a violation of 31 U.S.C. § 3729(a)(1)(A) & (B), as amended.

## COUNT III
## VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(A) & (B)[3]
## BY STEALING UNEARNED TITLE IV FUNDS
## (AGAINST ALL DEFENDANTS)

131.    Mr. Mayers re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

132.    Defendants have knowingly and willfully transferred unearned Title IV funds into their operating account.

133.    Defendants have knowingly and willfully failed to refund unearned Title IV funds to students or the Department.

134.    Defendants have treated these funds as their own.

135.    Defendants have knowingly and falsely concealed this conduct by falsifying documents and electronic records in the manner described above.

136.    Defendants also knew that the Department would rely and continues to rely on Defendant's truthfulness and sound administration as a fiduciary for the Department and students when allowing Defendants to transfer Title IV funds from the G-5 federal account into Defendant's operating account.

137.    Defendants knowingly and falsely certified their compliance with the PPA, federal statutes and regulations, and their lawful entitlement to payment each time they disbursed Title IV funds into their operating account without earning the tuition payment disbursed.

138.    Defendants' fraudulent claims were presented and paid and continue to be presented and paid by the Department from the Department's G-5 federal account.

139.    Defendants' conduct is a violation of 31 U.S.C. § 3729(a)(1)(A) & (B), as amended.

_____

[3] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint also alleges violations of the federal False Claims Act prior to its recent amendments e.g., 31 U.S.C. § 3729(a)(1).

**COUNT IV**
**VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(A) & (B)[4]**
**BY RECEIVING PAYMENT OF FEDERAL FUNDS**
**IN EXCHANGE FOR PIRATED TEXTBOOKS**
**(AGAINST ALL DEFENDANTS)**

140.    Mr. Mayers re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth below.

141.    Defendants knowingly and willfully sold pirated digital textbooks to students.

142.    Defendants knowingly transferred and received Title IV federal funds into their operating account as payment for the pirated digital textbook.

143.    The PPA and federal statutes and regulations require Defendants to take affirmative action to prevent the dissemination of pirated material as a condition of participating as a Title IV institution.

144.    Defendants knowingly and falsely certified their compliance with the PPA, federal law, and their lawful entitlement to payment each time they disbursed Title IV funds into their operating account to pay for these stolen digital textbooks.

145.    Defendants' fraudulent claims were presented and paid and continue to be presented and paid by the Department from the Department's G-5 federal account.

146.    Defendants' conduct is a violation of 31 U.S.C. § 3729(a)(1)(A) & (B), as amended.

**COUNT V**
**VIOLATION OF 31 U.S.C. § 3730(h)**
**FOR RETALIATING AGAINST PLAINTIFF-RELATOR**
**(AGAINST ALL DEFENDANTS)**

147.    Mr. Mayers re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth below.

---

[4] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint also alleges violations of the federal False Claims Act prior to its recent amendments e.g., 31 U.S.C. § 3729(a)(1).

148.  Mr. Mayers has personal knowledge of Defendants' false claims by virtue of his former employment at LSC.

149.  Mr. Mayers objected to many of the above-described practices.

150.  After Mr. Mayers demanded that LACY remedy many of these practices, he was terminated.

151.  Defendants terminated Mr. Mayers in retaliation for his effort to stop Defendants' wrongful conduct.

152.  As a result of his termination, Mr. Mayers lost income he would have otherwise earned.

153.  Defendants' conduct is violation of 31 U.S.C. § 3730(h), as amended

## **PRAYER**

WHEREFORE, Plaintiff-Relator on behalf of himself and the UNITED STATES, pursuant to 31 U.S.C. § 3730 prays:

(a)     That Defendants cease and desist from violating the federal False Claims Act, 31 U.S.C. §§ 3729 et seq.;

(b)     That this Court enter judgment against Defendants:

    i.   Awarding an amount equal to three times the damages that the UNITED STATES has sustained because of Defendants' conduct, plus civil penalties of at least $5,000 to $10,000, with penalties adjusted upwardly as specified by applicable law, for each act in violation of 31 U.S.C. § 3729;

    ii.  Awarding Plaintiff-Relator the appropriate bounty as supported by 31 U.S.C. § 3730; and

    iii. Awarding Plaintiff-Relator attorneys' fees and costs of this action, with interest, including the costs to the UNITED STATES for its expenses related to this action;

    (c)      That Defendants disgorge all sums by which they have been unjustly enriched by their wrongful conduct;

    (d)      That Plaintiff-Relator receive two times the back pay he is owed from the date of his wrongful termination, plus interest, special damages, costs, and attorneys' fees, pursuant to 31 U.S.C. § 3730(h);

    (e)      That the UNITED STATES and Plaintiff-Relator receive all relief, both at law and at equity, to which they may reasonably be entitled;

    (f)      That the Court order such further relief as it deems just and proper.

### <u>REQUEST FOR TRIAL BY JURY</u>

Plaintiff-Relator hereby demands a trial by jury.

Respectfully submitted by:

<u>s/Richard A. Harpootlian</u>
Richard A. Harpootlian (Fed. ID 1730)
rah@harpootlianlaw.com
Graham L. Newman (Fed. ID 9746)
gln@harpootlianlaw.com
M. David Scott (Fed. ID 8000)
mds@harpootlianlaw.com
Christopher P. Kenney (Fed. ID 11314)
cpk@harpootlianlaw.com
RICHARD A. HARPOOTLIAN, PA
1410 Laurel Street (29201)
Post Office Box 1090
Columbia, South Carolina 29202
Telephone: (803) 252-4848
Facsimile: (803) 252-4810

Columbia, South Carolina
January 23, 2013