# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# AIKEN DIVISION

|   |   |   |
|---|---|---|
| United States of America, *ex rel.* Shawn Mayers, | ) ) ) ) | Civil Action No. 1:13-cv-00218-JMC |
| Plaintiffs, | ) ) | **ORDER AND OPINION** |
| v. | ) ) |   |
| Lacy School of Cosmetology, LLC and Ernest J. "Jay" Lacy, | ) ) ) |   |
| Defendants. | ) ) |   |
| _____ | ) |   |

## I.    INTRODUCTION

Plaintiff United States of America filed this action against Defendants Lacy School of Cosmetology, LLC ("LSC") and Ernest J. "Jay" Lacy ("Lacy") (collectively "Defendants"). This matter comes before the court on Plaintiff's Motion for Default Judgment against Defendants. (ECF Nos. 49–52.)  For the reasons below, Plaintiff's Motion for Default Judgment (ECF Nos. 49–52) is **GRANTED.**

## II.    PROCEDURAL BACKGROUND

*Qui tam* Relator Shawn Mayers filed this False Claims Act, 31 U.S.C. §§ 3729 *et seq*. ("FCA"), action under seal on January 23, 2013.  (ECF No. 1.)   The United States filed a notice of election exercising its right under 31 U.S.C. § 3730(b) to intervene in this action on November 3, 2014.  (ECF No. 22.)   Thereafter, the United States filed an Intervenor Complaint seeking to recover damages suffered by the United States Department of Education ("Department").  (ECF No. 28.)   Plaintiff served Defendants on April 28, 2015, (ECF Nos. 37, 38), and Defendants failed to answer.   The Clerk entered default on July 24, 2015.  (ECF No. 45.)

On October 27, 2015, the United States moved the Court to enter a default judgment against

Defendants, jointly and severally, in the amount of nine million two hundred eighty-three thousand one hundred twenty-three dollars and no cents ($9,283,123.00). (ECF. Nos. 49, 49-5.)

### III.   FINDINGS OF FACT AND CONCLUSION OF LAW

The court makes the following findings of fact and conclusions of law:

A. Relevant Facts and Legal Background

1.     LSC provided coursework to students seeking certificates as cosmetologists, nail technicians, and estheticians. (Compl. ¶ 9.) LSC also provided continuing education coursework to current practitioners. (*Id*.) LSC operated four campuses in South Carolina: Aiken (the main campus), Lexington, Goose Creek, and Charleston. (*Id*.) Many of LSC's students received federal financial tuition assistance or "financial aid." (*Id.* ¶ 35.)

2.     LSC charges a total of $18,615 for this course work: $100 admission fee; $16,900 in tuition; $1,450 for tools, books and supplies; and $165 State Board Test fee. (*Id.* ¶ 38.) Students with a financial need can finance the entire cost of their cosmetology education through Pell Grants and student loans. (*Id*.)

3.     Under the framework of the Title IV Higher Education Act of 1965 ("HEA"), Congress established various student loan and grant programs to financially assist eligible students in obtaining a post-secondary education. *See* 20 U.S.C. § 1070(a).

4.     In pertinent part here, this includes Pell Grants and three types of Direct Loans (subsidized or "DLS", unsubsidized or "DLU", and PLUS or "DLP"). (Compl. ¶ 9.) The Department administers the Federal Student Aid ("FSA") programs under Title IV of the HEA. (*Id.* ¶ 22.)

5.     Although the mechanisms by which FSA funds are disbursed vary under each

program, all require compliance with specific conditions as a prerequisite to requesting and obtaining federal funds. Specifically, institutions must enter into a program participation agreement ("PPA") with the Department. *See* 20 U.S.C. § 1094(a); *see also* 34 C.F.R. § 668.8 (defining "eligible program"). Compliance with the PPA and the incorporated regulatory and statutory scheme is a material condition for receiving payment of program monies. *See id.* In executing a PPA, a participating institution agrees it "understands and agrees that it is subject to and will comply with the program statutes and implementing regulation . . . ." (ECF No. 50 at 1.)

6. The Department often does not provide FSA funds directly to students, but instead relies on approved Title IV institutions to draw student funds from a federal account (a "G5 account") containing FSA funds as the funds are earned by the institution. (Compl. ¶ 24.) The Department makes money available in an account and the school draws the funds, disburses the money, and reports disbursements back to the Department. (*Id.* ¶¶ 24–28.) These FSA fund drawdowns must be supported by coursework pursued and expenses incurred by the student and any excess funds drawn must be refunded to the student. *See* 34 C.F.R. § 668.165; *see also id.* § 668.162(e).

7. LSC is an "hours school," meaning it admits students who complete their coursework on a rolling basis. (Compl. ¶ 31.) A full-time student can complete the 1,500-hour program within 188 days of enrollment and is scheduled to complete this coursework within one calendar year from the date that classes begin. (*Id.* ¶ 24.) Hours schools are authorized to make FSA disbursements at established waypoints. *See* 34 C.F.R. § 668.4(c). Funds at LSC are not "earned" until the required hours are completed. (*Id.* ¶¶ 41–44.)

  B. <u>Plaintiff's Claims</u>

1. Plaintiff claims Defendants misappropriated FSA funds by knowingly failing to

comply with a slew of PPA regulatory requirements, making unauthorized disbursements of FSA funds, failing to refund student credit balances, and concealing this fraud by falsifying records and submitting false statements of compliance to the Department.  (*Id.* ¶¶ 120–30.)

2. Plaintiff alleges that this conduct constitutes violations of the §§ 3729(a)(1)(A), (B) & (G) of the FCA.[1]

C. Legal Standard

1. The False Claims Act imposes civil liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;" *or* who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(A), (B) & (G).  To establish a FCA violation, the government must prove "(1) a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 788 (4th Cir. 1999) ("*Harrison I*").

2. What constitutes a false or fraudulent claim is construed broadly to ensure the FCA is able to reach "all types of fraud, without qualification, that might result in financial loss to the Government."  *United States v. Neifert–White Co.*, 390 U.S. 228, 232 (1968); *see Harrison I*, 176

---

[1] Plaintiff also pled the federal common law theories of mistake, breach of contract, unjust enrichment, and conversion as alternative theories of recovery.  (Compl. ¶¶ 131–53.)

F.3d at 788. Moreover, federal courts routinely have recognized FCA violations arising from PPA violations. *See*, *e.g.*, *United States Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039 (11th Cir. 2015); *United States v. Corinthian Colleges*, 655 F.3d 984 (9th Cir. 2011); *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914 (7th Cir. 2005).

       3.     FCA liability attaches to the knowing submission of a false claim. A defendant acts "knowingly" within the meaning of the act when the person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). As used in the FCA, reckless disregard "lies on a continuum between gross negligence and intentional harm," *United States ex rel. Ervin & Associates, Inc. v. Hamilton Sec. Grp., Inc.*, 370 F. Supp. 2d 18, 41 (D.D.C. 2005) (quoting *United States v. Krizek*, 111 F.3d 934, 941 (D.C. Cir.1997)), and is best understood as "an extension of gross negligence" or an "extreme version of ordinary negligence" that does not require willful or deliberate conduct. *Krizek*, 111 F.3d at 941. Stated differently, the FCA "require[s] no proof of specific intent to defraud" in order for a defendant to have the requisite mental culpability. 31 U.S.C. § 3729(b)(1)(B).

    D.    <u>The Court's Analysis</u>

       1.     Plaintiff claims that Defendants violated the FCA when they withdrew federal funds from the G5 account without having earned the money withdrawn and without having complied with regulations that form material prerequisites to receiving Title IV funds. (Compl. ¶¶ 120–30.) In support of its claims, Plaintiff has submitted affidavit testimony from Relator Shawn Mayers (ECF No. 49-2), Special Agent LaTrisha Stallings from the Department's Office of the Inspector General (ECF No. 49-4), and Department Program Review Specialist Sherry

Blackman (ECF No. 50). The Court has reviewed this testimony and the attachments to these affidavits and finds that they support Plaintiff's allegations concerning the scheme, generally, as well as the specific damages suffered.

2.     First, Relator Shawn Mayers' testimony is based on his personal knowledge as LSC's former Chief Operating Officer. (*See* ECF No. 49-2 at 4.) While employed by LSC from January 31, 2011 until September 20, 2012, Mr. Mayers witnessed practices he believed to be illegal. (*Id.*) These practices include the falsification of records used to track student FSA account balances, "zeroing out" student credit balances by adding phony charges, disbursing funds before they were earned, and falsifying records to conceal this conduct. (*Id.* at 6–8.) Using LSC records, Mr. Mayers also identified 33 students who received instruction from a LSC instructor who the South Carolina Department of Labor, Licensing and Regulation ("LLR") had not certified. (*Id.* at 7.) After confronting Lacy about these practices, Mr. Mayers ultimately was fired. (*Id.* at 4.)

3.     Additionally, Special Agent Stallings states that she began investigating Defendants' practices concerning Title IV funds since February 2013 and that her investigation included interviews with the Relator; LSC's former bookkeeper, human resources director, and bursar; a former LSC campus director; and LSC's warehouse manager. (ECF No. 49-4 at 1–2.) Agent Stallings also considered an interview by another government investigator with LSC's former financial aid officer and documents furnished by the Department. (*Id.* at 2.) Agent Stallings's investigation appeared to confirm that FSA funds were being misappropriated at Lacy's direction and that records had been falsified to conceal this scheme. (*See id.* at 2–4.)

4.     Finally, Department Program Review Specialist Sherry Blackman detailed the

Department's investigation of LSC, which also appears to corroborate many of Plaintiff's allegations and further describes steps the Department took prior to its revocation of LSC's PPA. (*See generally* ECF Nos. 50–52.) Ms. Blackman's Declaration moreover offers a detailed description of the manner in which the Department has calculated its losses and supports those calculations with documentary evidence. (ECF No. 50 at 4–7.) Specifically, Ms. Blackman explains:

> From the beginning of AY 2009/2010 (July 1, 2009) through the time of its termination of eligibility in March 2014, LSC obtained funds from the Department on 496 separate occasions. As set forth in Paragraphs 17-18 above, a requirement for each funding was a certification by LSC. LSC made these certifications despite the significant and material regulatory violations identified in the [Program Review Request ("PRR")], the [Final Program Review Determination ("FPRD")], the Revocation Letter, and the additional misconduct identified during the OIG investigation.
>
> Exhibit J to this Declaration is a table that sets forth the principal amount of funds (Pell Grants and Loans) received by LSC in the approximately five year period prior to the revocation of its provisional PPA in March 2014. This table also sets forth, for each loan program, the Department's calculation of Estimated Loss ("EL") liability as a result of the loan funds disbursed based on false certifications.

(*Id.*)

### E. Damages

1. Ms. Blackman calculated the total loss to the Department as $2,078,448 in Pell Grant funds and $106,593 in estimated losses on federally backed loans. (*Id.* at 7.)

2. Any person who violates the FCA is liable to the United States for (1) a civil penalty of not less than $5,500, and not more than $11,000, and (2) three times the government's damages. 31 U.S.C. § 3729(a). The imposition of treble damages and civil penalties is mandatory. *United States v. Rogan*, 459 F. Supp. 2d 692, 726 (N.D. Ill. 2006); *United States ex rel. Satalich v. City of Los Angeles*, 160 F. Supp. 2d 1092, 1104 (C.D. Cal. 2001).

3.The Court has carefully reviewed the evidence presented and finds, based on the preponderance of the evidence, that the government has proven single damages in an amount of $2,078,448 for the full value of Pell Grant funds and $106,593 in estimated losses on federally backed loans, for a total single damages loss of $2,185,041.

4.The FCA requires that this amount be trebled to $6,555,123. *See United States v. Rogan*, 459 F. Supp. 2d 692, 726 (N.D. Ill. 2006); *United States ex rel. Satalich v. City of Los Angeles*, 160 F. Supp. 2d 1092, 1104 (C.D. Cal. 2001).

5.The Court also finds by the preponderance of the evidence that Defendants submitted 496 total false or fraudulent claims in the form of certifications necessary to receive the payment of federal funds.

6.Since the FCA requires a statutory penalty of not less than $5,500 per false claim, and since Plaintiff's motion requests the statutory minimum, the Court finds this to be the appropriate per-claim penalty, resulting in a total civil penalty of $2,728,000.

F.Default Judgment

1.Rule 55(b) of the Federal Rules of Civil Procedure authorizes the entry of a default judgment when a defendant fails "to plead or otherwise defend" in accordance with the Rules. *United States v. Moradi*, 673 F.2d 725, 727 (4th Cir. 1982).

2.Defendants received actual notice of this action on April 28, 2015, by being personally served with the Summons and Intervenor Complaint in a manner that complies with the Federal Rules and affords due process. (ECF Nos. 37–38.) Defendants failed to answer or otherwise plead.

3.Any default judgment must be for "a sum certain or a sum that can be made certain

by computation at as supported by an affidavit and that the non-moving party is neither a minor nor an incompetent person."[2]  Fed. R. Civ. P. 55(b).  The Clerk's office therefore properly made an entry of default.  *See* Fed. R. Civ. P. 55(b)(1).  Defendants did not respond to Plaintiff's Motion under Fed. R. Civ. P. 55(b)(2).

## IV.     CONCLUSION

THEREFORE, IT IS ADJUDGED AND ORDERED that:

Defendants violated the False Claims Act, 31 U.S.C. § 3729, in the manner described above and this conduct resulted in the presentation of false claims and statements to the Department of Education which resulted in damage to the United States.  Plaintiff's Motion for Default Judgment (ECF Nos. 49–52) is **GRANTED**.

The Clerk is ordered to enroll a judgment against Defendants, Lacy School of Cosmetology, LLC and Ernest J. "Jay" Lacy, jointly and severally, in the United States' favor in an amount of nine million two hundred eighty three thousand one hundred twenty three dollars and no cents ($9,283,123.00).

**IT IS SO ORDERED.**

*J. Michelle Childs*
United States District Judge

December 14, 2015
Columbia, South Carolina

---

[2] Defendant Lacy is not a minor or incompetent person.  Nor is he a member on active duty service in the military.  Defendant LSC is a limited liability company organized under the laws of South Carolina.  (Compl. ¶¶ 8–10.)  Lacy is LSC's sole owner, President and Chief Executive Officer.  (*Id.*)